IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 19-00315-02-CR-W-DGK |
| | ) | |
| ROY O. FRANKLIN, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO
DENY DEFENDANT FRANKLIN'S MOTIONS TO SUPPRESS**

Before the Court are Defendant Roy Franklin's Motion to Suppress Evidence Seized Pursuant to Search Warrant Obtained for Social Media Records and Motion to Suppress Evidence Seized Pursuant to an Order Authorizing Interception of Wire and Electronic Communications. Defendant moves the Court to suppress all evidence obtained pursuant to a September 26, 2018, search warrant for his Instagram account as well as any evidence obtained pursuant to May 15, 2019, and June 13, 2019, wiretaps. For the following reasons, Defendant's motions should be denied.

## I. INTRODUCTION

On October 1, 2019, an Indictment was returned charging Defendant Roy Franklin with one count of conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (B), (C), (D) & 846, and one count of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) and (b). (Doc. 1) On October 13, 2020, a Superseding Indictment was returned that added the following charges against Defendant Roy Franklin: one count of conspiracy to possess firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C.

1

§ 924(o); one count of drive-by shooting, in violation of 18 U.S.C. § 36; one count of discharging a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(a)(A)(iii); one count of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) and (b); two counts of distribution of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D); three counts of distribution of a controlled substance near a school, in violation of 21 U.S.C. §§ 841(a)(1) and 860; and one count of possession with the intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). (Doc. 234)

On June 9, 2022, Defendant Franklin filed a motion to file the instant suppression motions out of time. (Doc. 614) After reviewing the Government's opposition and Defendant's reply, the Court granted Defendant's motion. (Docs. 621, 631, 635) Defendant's suppression motions were filed on June 22, 2022. (Docs. 647, 648) The Government filed a consolidated response on July 7, 2022. (Doc. No. 686) On July 8, 2022, a joint evidentiary hearing[1] was held on the limited issue of the scope of the search as it related to the social media records.[2] (Doc. 687) The Government appeared by Assistant United States Attorneys Ashleigh Ragner and Ben Hurst. Defendant Franklin was present, represented by appointed counsel Justin Johnston. Defendant Smith was present, represented by appointed counsel Angela Hasty. The Government called FBI Special Agent Douglas McKelway to testify. The following exhibits were admitted into evidence:

Government's Exhibit 1:    Search Warrant 18-SW-00222-JTM (Smith Instagram);
Government's Exhibit 2:    Search Warrant 18-SW-00337-REL (R. Franklin Instagram);

---

[1] Co-defendant Ladele Smith filed virtually identical motions to suppress evidence obtained from social media records and from wire and electronic communication interceptions. (Docs. 667, 668)

[2] Following a June 28, 2022, status conference, upon the parties' request, the Court noticed the hearing to encompass both the scope of the search as it related to social media records and the issue of necessity as it related to the Title III wiretap affidavits and applications. (Doc. 675) After hearing argument on the scope of testimony at the outset of the July 8, 2022, evidentiary hearing (Tr. at 3-11), the Court limited the scope of the hearing to the search of social media records only and allowed defense counsel to make an offer of proof as to the questions they would have asked on the topic of necessity. (Tr. at 13, 53-57)

| Government's Exhibit 3: | Title III Order and Documents: 19-WT-00001-RK for Target Telephone 1 (T. Garner); |
|---|---|
| Government's Exhibit 4: | Title III Order and Documents: 19-WT-00003-RK for Target Telephone 6 (R. Franklin); |
| Government's Exhibit 5: | Title III Order and Documents: 19-WT-00003-RK for Target Telephones 8 (Martin)[3] & 9 (R. Franklin); |
| Government's Exhibit 6: | Search Warrant 18-SW-00223-JTM (Smith YouTube); |
| Government's Exhibit 7: | Search Warrant 18-SW-00362-JTM (Smith Snapchat); and |
| Government's Exhibit 8: | Instagram Business Record (FBI193_00001 and FBI314_00001) (Smith & R. Franklin). |

On July 13, 2022, Defendant Franklin filed a consolidated reply on the issues raised by both motions.  (Doc. 692)

## II.  <u>FINDINGS OF FACT</u>

On the basis of the evidence presented at the suppression hearing, the undersigned submits the following proposed findings of fact:

1. Douglas McKelway is a Special Agent with the FBI and is currently assigned to the Violent Crimes Squad.  (Tr. at 15)  Special Agent McKelway is the case agent in this matter.  (Tr. at 16)

2. Special Agent McKelway has been with the FBI since 2016.  As a Special Agent assigned to the Violent Crime/Gang Squad, his official duties include, but are not limited to, investigation into gangs, criminal violations of the Controlled Substances Act, violent offenses, organized crime, and ongoing criminal enterprises.  During his tenure with the FBI, he has participated in numerous gang and controlled substance violation investigations.  While conducting such investigations, he has been the affiant on Title III intercepts, pen registers, and Global Positioning System (GPS) cellular telephone tracking warrants.  He has conducted

---

[3]Although the Government's Exhibit List identifies Target Telephone 8 as relating to Defendant Martin (Doc. 683), the record presently before the Court indicates Target Telephone 8 was used by Defendant Smith and the Court performed its analysis as such when addressing Defendant Smith's challenges.

extensive interviews, controlled drug purchases, surveillance, and served search and arrest warrants. He has received specialized training in the enforcement of federal controlled substances laws as well as on conducting Title III investigations. (Gvt. Exh. 2, ¶ 4 at WARR_01588-WARR_01589; Gvt. Exh. 7, ¶ 4 at WARR_01684-WARR_01685)

3. Special Agent McKelway's training and experience with the FBI has involved, *inter alia*: (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and the laundering and concealment of proceeds of drug trafficking; (b) surveillance; (c) analysis of documentary and physical evidence; and (d) participation in wire intercept investigations. Based on his training and experience, Special Agent McKelway has become familiar with the manner in which illegal drug traffickers conduct their drug-related businesses, including the methods employed by drug dealers to import and distribute illegal drugs, and their use of coded language to refer to illegal drugs, drug proceeds, and other aspects of illegal drug trafficking. He has been personally involved in numerous investigations involving the unlawful possession, manufacture, distribution, and smuggling of controlled substances. (Gvt. Exh. 2, ¶ 4 at WARR_01589; Gvt. Exh. 7, ¶ 4 at WARR_01684-WARR_01685)

4. On June 12, 2018, United States Magistrate Judge Matt J. Whitworth signed a search warrant for Defendant Smith's Instagram account. (Tr. at 25; Gvt. Exh. 1) The warrant application sought to search Defendant Smith's Instagram account, associated with the vanity names "dogg_246", "dellio_4", "dellio_246" and "Del_Chapo_", for evidence concerning violations of possession with the intent to distribute/distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and money laundering, in violation of 18 U.S.C. §§ 1956, 1957.

(Gvt. Exh. 1)  The executed warrant was provided to Facebook, along with Attachment A.  (Tr. at 52)  A separate warrant, supported by the same affidavit, was issued for Defendant's YouTube account the same date.  (Gvt. Exh. 6)

5.  In response to the search warrant for Defendant Smith's Instagram account, Facebook provided data for the date range of June 7, 2017, through June 12, 2018.  (Tr. at 23-24, 25; Gvt. Exh. 8 at FBI193_00001)

6.  On September 26, 2018, Special Agent McKelway submitted a search warrant application to United States Magistrate Judge Robert E. Larsen.  (Gvt. Exh. 2)  The warrant application sought to search Defendant Franklin's Instagram account, associated with the vanity name "Drankvett," for evidence concerning violations of possession with the intent to distribute/distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and money laundering, in violation of 18 U.S.C. §§ 1956, 1957.  (Gvt. Exh. 2)  Paragraph 16 of the affidavit advises, and includes through Attachment B, that a search warrant for Ladele Smith's Instagram accounts had been obtained.  (Gvt. Exh. 2)

7.  The items to be seized pursuant to the warrant application were incorporated through Attachment A, which identified the particular thing to be seized for the date range of January 1, 2017, through the then-present date.  (Gvt. Exh. 2 at WARR_01608-WARR_01612)

8.  Judge Larsen signed the search warrant for Defendant Franklin's Instagram account on September 26, 2018.  (Tr. at 25-26; Gvt. Exh. 2)

9.  The executed warrant, along with Attachment A, was provided to Facebook.  (Tr. at 52; Gvt. Exh. 2 at WARR_01535-WARR_1541)

10.  Facebook owns Instagram.  (Tr. at 17)

5

11.     In response to the search warrant for Defendant Roy Franklin's Instagram account, Facebook provided data for the date range of September 26, 2017, through September 26, 2018. (Tr. at 24, 25; Gvt. Exh. 8 at FBI314_00001)

12.     Special Agent McKelway testified that the general procedure when investigators obtain a search warrant for an Instagram account involves submitting the signed warrant to Facebook through an online portal. (Tr. at 16-17)  Upon receiving notification that the responsive data is ready, investigators download the data from the portal both in .pdf and .html format. (Tr. at 17, 29)

13.     FBI investigators then upload the .html files into a program called "Mint." (Tr. at 17)  Mint enables investigators to more easily review and narrow data. (Tr. at 18, 29)  Specifically, the program allows investigators to rank the Instagram user's contacts, filter data through keywords and locations, view results chronologically, and compare multiple data sets from different social media accounts. (Tr. at 18, 22, 38)

14.     Special Agent McKelway testified that when the data provided by Facebook includes photographs, investigators look at each one because Mint does not provide a filtering mechanism for photographs. (Tr. at 19)  Additionally, performing an individual review of the photographs is valuable to investigators because it may provide relevant information not retrievable by keyword (i.e., location, user of the account, unexplained wealth). (Tr. at 19, 51-52)

15.     Special Agent McKelway testified that in drug conspiracy cases, he searches social media records to determine the breadth of the conspiracy. (Tr. at 22)  He looks for who is involved, what their roles are, who holds the roles of suppliers/distributors/customers/enforcers, and who helps maintain residences and rent cars. (Tr. at 22)  Special Agent McKelway also looks for the

types and weights of drugs being sold and whether, and to what extent, firearms are being used. (Tr. at 22)

16. With regard to the specific searches performed in this case, Special Agent McKelway testified that he performed keyword searches for "816" or "913" in order to learn the phone numbers suspects were using. (Tr. at 19) He was particularly interested in the phone numbers Defendant Smith was using because Defendant Smith changed his number regularly. (Tr. at 19-20) Special Agent McKelway testified he also performed keyword searches for slang words referring to drugs, drug amounts, firearms, money, and the names and/or monikers of known co-conspirators. (Tr. at 20-21, 50)

17. Special Agent McKelway testified that in cases like the instant matter, the keywords he uses to search for drugs include "OG Kush" (referencing marijuana), "boy" (referencing heroin), "girl" (referencing cocaine), "fire" (referencing marijuana), "kill" (referencing marijuana), "lean" or "drink" (referencing codeine), and "perk" (referencing Percocet or prescription pills). (Tr. at 20-21) Other typical keyword search terms include slang terms for the weights of drugs, such as "QP," "zip," or "Z28." (Tr. at 21) Search terms related to firearms include "heat," "stick," "Glock," "AK," "45," and "drake." He also uses slang terms for money, such as "bread." (Tr. at 21)

18. Only when a keyword search produces results does Special Agent McKelway expand the conversation to look at the surrounding context. (Tr. at 21-22, 50)

19. Special Agent McKelway testified he followed the above-described procedure when executing the search warrant for both Defendant Smith and Defendant Roy Franklin's Instagram accounts. (Tr. at 23, 26, 48) He did not perform any searches related to location. (Tr.

7

at 39)

20.    Special Agent McKelway does not specifically remember each of the search terms he used.  (Tr. at 45-46)

21.    Special Agent McKelway did not keep a contemporaneous log or notes of the specific searches performed.  (Tr. at 43-44)

22.    Some of the results produced by Special Agent McKelway's keyword searches revealed conversations that were not relevant to this case.  (Tr. at 37, 49)

23.    Special Agent McKelway testified he did not open the files and individually review the .html files without the use of Mint, nor did he conduct any searches within the .pdf file or scroll its pages.  (Tr. at 30, 39-41)

24.    Special Agent McKelway did, however, review most of the images related to Defendant Smith and Franklin's accounts.  (Tr. at 36, 49)  While doing so in Defendant Franklin's account, he saw images that did not display drugs, money, guns, violence, criminal activity, or targets/named defendants.   (Tr. at 36-37)   With regard to Defendant Smith, Special Agent McKelway saw images that pertained to Defendant Smith's music career.  (Tr. at 49)

25.    Special Agent McKelway testified that he has access to Cellebrite.  (Tr. at 30).  He has not used the program to review native files produced by social media platforms or to use facial recognition algorithms, including in this case.  (Tr. at 30-33, 48)  Special Agent McKelway has used Cellebrite to review an iCloud warrant return.  (Tr. at 31)

26.    Special Agent McKelway testified that at the time investigators reviewed the data produced pursuant to the search warrants for Defendants Smith and Franklin's social media accounts, use of a facial recognition algorithm would have been too limiting since investigators

8

did not yet know the full extent of the conspiracy. (Tr. at 33) Likewise, Special Agent McKelway would not have used a tool that searched by exemplar images because images often appear differently and he would not trust a program to filter the images appropriately. (Tr. at 35)

27.     Special Agent McKelway testified that conversations or images that may not initially appear on their face to be related to drug trafficking may still be relevant, in that they can show who is utilizing the account or pertain to related topics such as unexplained wealth. (Tr. at 51-52)

28.     Special Agent McKelway testified that even if he had not first obtained Defendant Franklin's Instagram data, he still would have sought a wiretap for Defendant Franklin's cell phones (Target Telephones 6 and 9). (Tr. at 26-27) Special Agent McKelway explained that investigators had intercepted Target Telephone 6 on several occasions talking to Target Telephone 1 (Defendant Garner) about drug-related matters. (Tr. at 27) In such conversations, the user of Target Telephone 1 referred to the user of Target Telephone 6 as "Roy." (Tr. at 27) Investigators knew through source reporting that Defendant Roy Franklin was a close associate of Defendant Smith and that Defendant Roy Franklin was an enforcer for the 246 organization. (Tr. at 27-28) Special Agent McKelway further testified that a wiretap was sought for Target Telephone 9 based on interceptions investigators had received from Target Telephone 7. (Tr. at 28)

29.     On October 4, 2018, United States Magistrate Judge Sarah W. Hays signed a resubmitted search warrant for Defendant Smith's Snapchat account. (Gvt. Exh. 7) This warrant was sought for the same vanity names associated with Defendant Smith, but corrected the account names by removing the "@" contained in the original warrant. (Gvt. Exh. 7, ¶ 43 at WARR_01707)

## III. <u>DISCUSSION</u>

Although separate motions, the issues raised in Defendant's motions to suppress are related. Both the search warrant for Defendant's Instagram account and the Title III wiretaps were sought as part of the Government's investigation of Defendant and the 246 organization. Defendant maintains the search warrant for his Instagram account lacks probable cause and fails to meet the particularity requirement. Defendant challenges the wiretaps on grounds, *inter alia*, that the applications and affidavits reference information he maintains was unlawfully obtained from his Instagram account. Each motion will be addressed below.

### A. SEARCH WARRANT FOR INSTAGRAM ACCOUNT

Defendant challenges the September 26, 2018, search warrant for his Instagram account on grounds that: (1) the affidavit in support of the warrant failed to establish a nexus between the crimes alleged and the information sought; (2) the warrant and affidavit failed to meet the constitutional particularity requirement; and (3) law enforcement's search of the data seized pursuant to the warrant exceeded the scope of the warrant. The Government maintains Defendant's motion should be denied on grounds that: (1) the motions were untimely;[4] (2) probable cause supported issuance of the search warrant; (3) the warrant satisfied the Fourth Amendment's particularity and breadth requirements; (4) the good-faith exception to the exclusionary rule alternatively prevents suppression; and (5) law enforcement's execution of the warrant was reasonable.

---

[4] The Government states within its suggestions in opposition that it does not interpret the Court's order granting Defendant's motion for leave to file the instant suppression motions out of time (Doc. 635) "as finally resolving the question of timeliness" and reasserts its timeliness objections. (Doc. 686, pp. 4-6) Such objections are overruled. Defendant Franklin's motions were filed nine months after the pretrial motion deadline had passed. Given the voluminous discovery and counsel's appointment to this case as replacement counsel, however, the Court explicitly finds good cause supports the late filing.

1.      **PROBABLE CAUSE**

Issuance of a search warrant must be supported by probable cause, which exists under a totality of the circumstances, when there is a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Smith*, 21 F.4th 510, 514 (8th Cir. 2021) (quoting *United States v. Gater*, 868 F.3d 657, 660 (8th Cir. 2017)); *United States v. Daigle*, 947 F.3d 1076, 1081 (8th Cir. 2020); *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016). A search warrant application must contain "evidence of a nexus between the contraband and the place to be searched." *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017) (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016)). Judges may draw reasonable inferences when determining the existence of probable cause. *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009). Judges can also consider the experience of the affiant. *See, e.g., id.* at 943-44; *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007). *But cf. United States v. Brunette*, 256 F.3d 14, 18-19 (1st Cir. 2001) (holding magistrate judge should have independently reviewed photographs rather than relying on affiant's conclusion that the images were pornographic). "[P]robable cause is about fair probabilities, not near certainties." *United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021) (quotation omitted).

A reviewing court must ensure that the magistrate judge who issued the warrant "had a 'substantial basis for concluding that probable cause existed.'" *Johnson*, 848 F.3d at 876 (quoting *Colbert*, 828 F.3d at 726). Review is thus limited to the four corners of the affidavit that was relied upon by the issuing judge. *Daigle*, 947 F.3d at 1081; *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005).

In this case, examination of the information contained within the four corners of Special

Agent McKelway's affidavit reveals a substantial basis for Judge Larsen to have concluded that probable cause existed. Specifically, two separate Instagram Direct group messages, in which Defendant was included, support a fair probability that evidence of criminal activity would be found within Defendant's Instagram account. The affidavit states that Defendant and others had been identified as members of the 246 organization through confidential sources, the Kansas City, Missouri Police Department, and by the FBI. (Gvt. Exh. 2, ¶ 14 at WARR_01593-WARR_01595) Investigators believed members of the 246 organization and their associates had participated in multiple criminal offenses including homicide, assault, robbery, and illegal drug distribution and trafficking. (Gvt. Exh. 2, ¶ 14 at WARR_01592-WARR_01593) Evidence received pursuant to a search warrant for Ladele Smith's Instagram account contained an April 14, 2018, Instagram Direct group message between 246 members, including Ladele Smith and Defendant, in which the user of Defendant's Instagram account discussed tactics for the exchange of drugs and made a statement which could be interpreted as a call for other individuals in the message to engage in violent activity. (Gvt. Exh. 2, ¶ 20 at WARR_01597-WARR_01599) The affidavit set forth the entirety of this specific conversation, both within the text and separately in Attachment C. (Gvt. Exh. 2, ¶¶ 18-20 at WARR_01596-WARR_01599) Attachment C states:

| DATE | FROM | TO | ORIGINAL TEXT |
|---|---|---|---|
| 2018-04-24 7:29:20 (UTC) | Tone Carleeon | Group | I'm cool with a lot of ni****s but 1 thing for sure 2 for certain I'm riding with the home team RIP DUCK and I mean that sh** I don't care how cool we are u don't respect him iont respect u |
| | Problock Tre | | 100 |
| 2018-04-24 7:36:28 (UTC) | Tha Locc | Group | Clown |

12

| | | | |
|---|---|---|---|
| 2018-04-24 7:37:56 (UTC) | HeavyPocketsDeej | Group | WFF is ProBlock doing tho?!! |
| 2018-04-24 7:38:12 (UTC) | Tha Locc | Group | I seen that Omm |
| 2018-04-24 7:38:24 (UTC) | Tone Carleeon | Group | Jeffin cus he f***ing brionna |
| 2018-04-24 7:38:27 (UTC) | HeavyPocketsDeej | Group | Next time I see Danny Ima do em dirty watch |
| 2018-04-24 7:38:35 (UTC) | 2CupsCord | Group | He liked the paint ball sh** |
| 2018-04-24 7:39:03 (UTC) | Tha Locc | Group | It's on on God |
| 2018-04-24 7:39:22 (UTC) | 2cup2Cord | Group | Aw sh** I didn't see that he goofy asf |
| 2018-04-24 7:39:24 (UTC) | Tha Locc | Group | I'm back and on alllllllllllll bullsh** |
| 2018-04-24 7:39:57 (UTC) | Drankvett | Group | Hit em up GANG |
| 2018-04-24 7:40:43 (UTC) | Tone Carleeon | Group | Yea ni*** know ni***s be disrespecting his dead ass cousin ni*** do sh** |
| 2018-04-24 7:41:53 (UTC) | Drankvett | Group | Ooh sh** let me gt my paper first |
| 2018-04-24 7:42:41 (UTC) | HeavyPocketsDeej | Group | On Tank Ima disrespect dat ni*** |
| 2018-04-24 7:48:57 (UTC) | Tone Carleeon | Group | I just talk to Nelly 41 he said he don't have no ideal who it could of been they said it was new booty keep Cherokee renta |
| 2018-04-24 7:49:40 (UTC) | HeavyPocketsDeej | Group | Ni***s got too much F O N K |
| 2018-04-24 7:49:54 (UTC) | HeavyPocketsDeej | Group | GOTTA START HANDLING SH** |
| 2018-04-24 7:50:33 (UTC) | 2CupsCord | Group | Yeah but I want Rodriguez he gave up the load |
| 2018-04-24 7:51:04 (UTC) | Drankvett | Group | Gtta start Droppin sh** them pull ups be a waste of time |
| 2018-04-24 7:51:21 (UTC) | 2CupsCord | Group | Right |
| 2018-04-24 7:58:27 (UTC) | 2CupsCord | Group | True. But it's like it was a stand off to see who was gone get they sh**. And our sh** was ready |
| 2018-04-24 7:59:22 (UTC) | 2CupsCord | Group | Man what why TF he do that goofy sh** for |
| 2018-04-24 8:04:46 (UTC) | Tha Locc | Group | This dm ant for all that gang be cool on here |
| 2018-04-24 8:17:24 (UTC) | 2CupsCord | Group | You right LOC start a text group |

(Gvt. Exh. 2 at WARR_01658-WARR_01659) The affidavit states that Special Agent McKelway

believed this conversation referenced that 246 members included in the group message were angry

that their ally, "Problock Tre," appeared to be supporting their historical enemy. (Gvt. Exh. 2, ¶

20(b) at WARR_01597) The members' responses within the group message appeared to indicate

a feud involving firearms was starting, to which the user associated with Defendant's Instagram account said, "Hit em up GANG." (Gvt. Exh. 2, ¶ 20(b) at WARR_01597) Based on Special Agent McKelway's training and experience and the context of the conversation, he believed this comment could indicate a desire or a command for action from the rest of the group members. (Gvt. Exh. 2, ¶ 20(c) at WARR_01598)

The affidavit goes on to explain the third comment in the April 14, 2018, conversation attributable to the user of Defendant's Instagram account. Special Agent McKelway believed that the statement "Gtta start Droppin sh** them pull ups be a waste of time" appeared to be advising the members in the group to change their tactics. Based on his training and experience, Special Agent McKelway knew that "pull ups" could be a reference to two vehicles pulling up next to each other to conduct a drug transaction and that "Droppin sh**" could be a reference to using a drop location for drugs and money instead of meeting in person in cars pulled up next to each other. (Gvt. Exh. 2, ¶ 20(d) at WARR_01598) The affidavit states using drop locations is a method drug dealers use in order to deter law enforcement and to attempt to lessen the dangers associated with meeting face-to-face. (Gvt. Exh. 2, ¶ 20(d) at WARR_01598) Although the comment made by the user of Defendant's Instagram referencing distribution tactics stands alone, the responsive statements by group members underscore the nature of the conversation. To be sure, the user associated with the vanity name "2CupsCord" stated, "Right" and, approximately seven minutes later, continued, "True. But it's like it was a stand off to see who was gone get they sh**. And our sh** was ready." Special Agent McKelway believed "2CupsCord" was referencing a previous event and that the individuals involved in the group message were not robbed of their drugs. (Gvt. Exh. 2, ¶ 20(e) at WARR_01598-WARR_01599) The user associated with the vanity name "Tha

14

Locc" stated, "This dm ant for all that gang be cool on here", to which the user associated with the vanity name "2Cups Cord" replied, "You right LOC start a text group". Agent McKelway believed "Tha Locc" and "2CupsCord" realized the users participating in the Instagram Direct group message were talking about criminal activity, and that a text group was a more secure or better environment to discuss that business. (Gvt. Exh. 2, ¶ 20(f) at WARR_01599) Special Agent McKelway is an experienced law enforcement officer who is knowledgeable about drug dealers' use of coded language to refer to illegal drugs, drug proceeds, and other aspects of illegal drug trafficking. (Gvt. Exh. 2, ¶ 4 at WARR_01588-WARR_01589) As such, Judge Larsen was permitted to reply on his knowledge and experience in interpreting such conversations.

The second Instagram Direct group message obtained from the search warrant for Ladele Smith's Instagram account contained a May 23, 2018, conversation message between the same 246 members. (Gvt. Exh. 2, ¶¶ 21-22 at WARR_01599-WARR_01601) The affidavit again included the specific conversation, both within the text and separately in Attachment D. (Gvt. Exh. 2, ¶¶ 21-22 at WARR_01599-WARR_01601, WARR_01664-WARR_01666) Although Defendant was included in this group message, he did not individually comment. Special Agent McKelway opined the May 23, 2018, conversation involved seeking and receiving permission to kill rival gang members. (Gvt. Exh. 2, ¶¶ 21 at WARR_01599-WARR_01600)

Despite Defendant's argument to the contrary, the affidavit in support of the search warrant for Defendant's Instagram account contained more than the conclusory assertions of a law enforcement officer. The affidavit, as set forth above, specifically identifies and interprets the conversations on which Special Agent McKelway based his assertions. The April 14, 2018, message contains a comment by the user of Defendant's Instagram account related to the manner

15

in which the group conducted drug transactions. Although the May 23, 2018, conversation did not contain individual comments made by the user of Defendant's Instagram account, the mere inclusion in a group comprised of members believed to be involved in illegal drug distribution and trafficking indicates a fair probability that evidence of crime would be found within Defendant's own Instagram account. Special Agent McKelway further stated gang members and drug dealers often use social media platforms to post photographs, videos, and otherwise facilitate unlawful activity. (Gvt. Exh. 2, ¶ 10 at WARR_01591-WARR_01592). Special Agent McKelway believed Defendant's Instagram account contained evidence of controlled substance violations. (Gvt. Exh. 2, ¶ 21-22 at WARR_01606)

The totality of these circumstances, as established by the evidence obtained through Ladele Smith's Instagram account, Defendant's inclusion and participation in group conversations amongst known 246 members discussing drug transactions and violent acts, and Special Agent McKelway's interpretation of such conversations, demonstrate that the affidavit contained a sufficient nexus between Defendant's Instagram account and the crime of possession with the intent to distribute/distribution of a controlled substance. Defendant's motion to suppress should be denied on this basis.

## 2.     PARTICULARITY AND BREADTH

Defendant also contends the warrant did not satisfy the Fourth Amendment's particularity requirement because the warrant sought the entirety of his Instagram account. Defendant argues that, without meaningful limitations in scope and time, the warrant was akin to a general warrant. The Court disagrees.

The Fourth Amendment requires warrants to "particularly describ[e] the place to be

searched, and the persons or things to be seized." U.S. CONST. amend. IV. *See also United States v. Eggerson*, 999 F.3d 1121, 1124 (8th Cir. 2021); *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007). "The degree of specificity required will depend on the circumstances of the case and on the type of items involved." *Summage*, 481 F.3d at 1079. "The particularity requirement 'is a standard of "practical accuracy" rather than a hypertechnical one.'" *Id*. (quoting *United States v. Peters*, 92 F.3d 768, 769-70 (8th Cir. 1996)).

When evaluating the particularity requirement, the Eighth Circuit has focused on whether the offense being investigated was sufficiently identified in the warrant. *United States v. Good Voice*, No. 3:21-CR-30059-RAL, 2022 WL 1448851 at *11 (D.S.D. May 9, 2022) (collecting cases). This standard enables the searcher "to locate and identify the places and items with reasonable effort and to avoid mistakenly searching the wrong places or seizing the wrong items." *United States v. Gleich*, 397 F.3d 608, 612 (8th Cir. 2005). The failure of a warrant "to anticipate the precise form in which [the data] would appear," however, is not fatal. *United States v. Lowe*, 50 F.3d 604, 607 (8th Cir. 1995).

In *United States v. Jones*, the District of Minnesota found that the particularity requirement was satisfied in an approach very similar to the approach challenged here. No. 19-cr-341 (NEB/LIB), 2021 WL 1321270, at *12-*13 (D. Minn. Jan. 7, 2021). In *Jones*, law enforcement submitted an application to search the contents of the defendant's Facebook account. 2021 WL 1321270 at *6. "Section I" of "Attachment B" to the application sought Facebook to *disclose* broad categories of information from the defendant's account. *Id*. "Section II" of "Attachment B" to the application then sought authorization for law enforcement to *seize* more limited categories

17

of information that were tied to the charged offense and limited in time.[5]  *Id.*  In finding the application to be sufficiently particular, the *Jones* Court explained, "[t]he Facebook account was identified by the specific account number, and the Search Warrant delineated the items to be included in the search."  *Id.* at 13.

The same outcome should be reached in this case.  Although Defendant urges an approach that would require warrants to request specific information from social media companies,[6] the September 26, 2018, search warrant submitted for Defendant's Instagram account comports with the law of this Circuit.  *See United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008); *United States v. Sherman*, 372 Fed. Appx. 668, 676 (8th Cir. 2010); *Gleich*, 397 F.3d at 612; *Good Voice*, 2022 WL 1448851 at *11; *Jones*, 2021 WL 1321270 at *12.  Moreover, law enforcement's ability to successfully predict where information may be found is, as a practical matter, uncertain at best since information may be concealed or seem irrelevant on its face.  *See Lowe*, 50 F.3d at 607; *Good Voice*, 2022 WL 1448851 at *12.

Here, Attachment A to the search warrant application for Defendant's Instagram account specifically identified Defendant's User ID and Username/Vanity Name.  (Gvt. Exh. 2, at WARR_01608)  The language contained within Section II of Attachment A, limited the items to be seized to information that constituted fruits, evidence and instrumentalities of violations of, *inter alia*, Title 21, United States Code, Sections 841(a)(1) for possession with the intent to

---

[5]The Court notes this approach is also consistent with Federal Rule of Criminal Procedure 41(e)(1)(B) which provides, "A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure of copying of electronically stored information.  Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."

[6]*See United States v. Blake*, 868 F.3d 960 (11th Cir. 2017); *United States v. Burkhow*, No. 19-CR-59-CJW-MAR, 2020 WL 589536 (N.D. Iowa Feb. 6, 2020) (finding warrant was not sufficiently particular due to lack of temporal limitation, but applying good faith exception to deny suppression); *United States v. Hamilton*, No. 6:18-CR-57-REW-10, 2019 WL 4455997 (E.D. Ky. Aug. 30, 2019); *United States  v. Chavez*, 423 F. Supp. 3d 194 (W.D.N.C. 2019); *United States v. Irving*, 347 F. Supp. 3d 615 (D. Kan. 2018).

distribute and distribution of controlled substances. (Gvt. Exh. 2, at WARR_01611) Section II of Attachment A lists the specific types of information from January 1, 2017, through the then-present date to include:

a) Communications by the Target Subjects as well as any communication regarding narcotics trafficking, gang related matters, firearms, homicides, and business or crimes related to Target Subjects and their associates; photographs related to narcotics trafficking, gang related matters, firearms, homicides, and business or crimes related to Target Subjects and their associates; communication regarding narcotics trafficking and manufacturing; communication regarding acts of violence and efforts to avoid law enforcement apprehension; communication regarding the recruitment of new members; communication regarding the destruction of evidence; communication regarding the account user's location on the date of certain racketeering-related criminal acts; and

b) Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

(Gvt. Exh. 2, at WARR_01611-WARR_01612) These limitations ensured against searching the wrong places and/or seizing the wrong items.

Attachment A also includes a temporal limitation. Although the warrant requested information starting on January 1, 2017, Facebook instead provided data beginning on September 26, 2017.[7] (Fact No. 11) This limited time frame is less than seven months before the April 14, 2018, Instagram Direct group message in which Defendant discussed drug trafficking methods and also falls within the time period the affidavit attributed to the 246 organization's illegal drug distribution and trafficking. (Gvt. Exh. 2 ¶ 12, at WARR_01592-WARR_001593) The Court, therefore, finds that the search warrant for Defendant's Instagram account satisfies the Fourth Amendment's particularity requirement and is not constitutionally overbroad.

---

[7]The Government stated it does not intend to introduce any evidence seized pursuant to the warrant before this time. (Doc. 686, p. 27)

**3.      EXECUTION OF WARRANT**

Defendant next argues that the Government's search of the Instagram account data provided by Facebook exceeded the scope of the warrant.  This argument is without merit.

Special Agent McKelway testified that when the FBI receives data from Facebook, investigators upload the .html files into a program called "Mint."  (Fact No. 13)  This program allows investigators to rank the Instagram user's contacts, filter data through keywords and locations, view results chronologically, and compare multiple data sets from different social media accounts.  (Fact No. 13)  Special Agent McKelway filtered the data from Defendant's Instagram account using Mint by performing keyword searches.  (Fact No. 16)  He searched for "816" and "913" to learn the phone numbers suspects were using; he also searched for slang terms referring to drugs, drug amounts, firearms, money, and the names and/or monikers of known co-conspirators.  (Fact Nos. 16, 19)  Only when the keyword searches produced results did Special Agent McKelway expand the conversation to look at the context.  (Fact Nos. 18, 19)  Special Agent McKelway testified he did not open and individually review the .html files without the use of Mint or conduct searches within or scroll the pages of the .pdf file.  (Fact No. 23)  Due to the fact that Mint did not have facial recognition capabilities and also because he did not trust a program to appropriately filter images, Special Agent McKelway reviewed most images.  (Fact Nos. 24, 26)  He testified that individually reviewing the images was valuable because images may provide relevant information that is not evident on its face, such as location, the user of the account, or unexplained wealth.  (Fact No. 27)  This procedure reasonably limited the search to locate and seize the information identified in Section II of Attachment A.  Defendant's motion to suppress is denied on this ground.

20

**4.     GOOD FAITH EXCEPTION TO THE EXCLUSIONARY RULE**

Even if the search warrant application were found to be deficient, either for a lack of probable cause or for failure to comply with the particularity requirement, evidence obtained pursuant to the warrant should not be excluded based on application of the good faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984). "In *Leon*, the Supreme Court held that evidence obtained pursuant to a subsequently invalidated search warrant need not be excluded from the prosecution's case in chief if the executing officers acted in objectively reasonable reliance on the issuing court's determination." *United States v. Terry*, 305 F.3d 818, 823 (8th Cir. 2002) (citing *Leon*, 468 U.S. at 922-23). *See also United States v. Szczerba*, 987 F.3d 929, 938 (8th Cir. 2018); *United States v. Ross*, 487 F.3d 1120, 1122 (8th Cir. 2007).

*Leon* identified "four circumstances in which an officer's reliance on an invalid warrant would not be objectively reasonable:  (1) when the issuing magistrate [judge] 'was misled by information in an affidavit that the affiant knew was false or would have known was false' absent 'reckless disregard of the truth'; (2) when the issuing magistrate [judge] 'wholly abandoned his judicial role'; (3) when the affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) when the warrant is 'so facially deficient – *i.e.*, in failing to particularize the place to be searched or the things to be seized – that the executing officer cannot reasonably presume it to be valid.'" *United States v. Saddler*, 194 F.4th 1035, 1040 (8th Cir. 2021). *See also United States v. Barnes*, 9 F.4th 977, 979 (8th Cir. 2021). "[T]he fact that a neutral [judge] has issued a warrant is the clearest indication that . . . officers acted in an objectively reasonable manner or in objective good faith." *United States v. Harris*, No. 20-CR-98 (SRN/TNL), 2021 WL 3929270 at *3 (D. Minn. Sept. 2, 2021) (quoting *Messerschmidt v.*

*Millender*, 565 U.S. 535, 546 (2012)).

In this case, the third and fourth circumstances are contemplated by Defendant's arguments, but neither support suppression. As stated above, III(A)(1), the search warrant for Defendant's Instagram account was supported by probable cause. Special Agent McKelway knew that Judge Larsen found the warrant to establish probable cause. His belief that the affidavit established probable cause was thus objectively reasonable. Additionally, the limitations contained within Attachment A were not so facially deficient so as to render Special Agent McKelway's reliance on the warrant's validity unreasonable. The Court, therefore, finds the good faith exception applies and that suppression is not appropriate.

## B. WIRETAP ORDERS

At issue are the May 15, 2019, wiretap application[8] for Target Telephone 6 and the June 13, 2019, wiretap application for Target Telephone 9. To obtain a wiretap, the government must establish the following four requirements:

(a) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
(b) There is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
(c) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
(d) . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). Defendant argues that subsections (b) and (c) were not met for either Target Telephone 6 or Target Telephone 9.

---

[8]Although the May 15, 2019, application and affidavit reference Target Telephone 7 as also belonging to Defendant Roy Franklin, it was determined that Target Telephone 7 belonged to co-defendant Sirico Franklin. (Gvt. Exh. 5, Exhibit C at ¶ 13(a))

1. **PROBABLE CAUSE**

"The probable cause requirement in [§ 2518] is linked to the Fourth Amendment." *United States v. Thompson*, 690 F.3d 977, 984 (8th Cir. 2012); *United States v. Perez-Trevino*, 891 F.3d 359, 368 (8th Cir. 2018). As such, "to grant an application for a wiretap, district courts must make a 'practical, common-sense decision whether,' considering the 'totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Thompson*, 690 F.3d at 984. Only evidence contained within the four corners of the affidavit may be considered when reviewing the probable cause determination. *Perez-Trevino*, 891 F.3d at 368.

a. **Target Telephone 6**

The affidavit in support of the May 15, 2019, wiretap application states that investigators believed Defendant used Target Telephone 6. (Gvt. Exh. 4, Exhibit C at ¶ 11) The affidavit also states records obtained from Defendant's Instagram account indicated Defendant was actively dealing drugs and using Target Telephone 6 to do so. (Gvt. Exh. 4, Exhibit C at ¶¶ 57, 58, 60-67) Special Agent McKelway's interpretations of conversations within the Instagram records, as informed by his training and experience, were properly considered. *See e.g., Keele*, 589 F.3d at 943-33. As more fully set forth above, *supra* Section III(A), seizure of Defendant's Instagram account was lawful thus permitting consideration in the Court's probable cause analysis. Even without consideration of the Instagram records, however, the May 15, 2019, wiretap application satisfies the probable cause requirement. Target Telephone 6 had been intercepted on several occasions talking to Target Telephone 1 about drug-related matters. (Gvt. Exh. 4, Exhibit C at ¶¶ 11(f), 70-74) *See United States v. Bellomo*, 954 F. Supp. 630, 638 n.3 (S.D.N.Y. 1997) ("A court is justified in relying on an expert's opinion as to evidence in a wiretap application, . . . [as it]

would defeat the purpose of the wiretap statute to allow criminals to avoid detection simply by using nicknames and code to disguise their activities."). Additionally, CS-1 told law enforcement that he thought Defendant was involved in drug sales, but was more prominent in the gang community for being an enforcer. (Gvt. Exh. 4, Exhibit C at ¶ 28) CS-1 is a documented confidential source for the FBI who has previously provided reliable and verified information and made controlled purchases. (Gvt. Exh. 4, Exhibit C at ¶¶ 22(a), 29) As such, the Court was entitled to rely on such statement. *United States v. Mayweather*, 993 F.3d 1035, 1044 (8th Cir. 2021); *United States v. Brown*, 499 F.3d 817, 821 (8th Cir. 2007); *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998). This information establishes a fair probability that Defendant was committing the offenses of possession with the intent to distribute/distribution of a controlled substance.

### b. Target Telephone 9

The probable cause requirement has also been satisfied for Target Telephone 9. The affidavit in support of the June 13, 2019, wiretap application states that investigators believed Defendant used Target Telephone 9. (Gvt. Exh. 5, Exhibit C at ¶ 13(b)). Interceptions from Target Telephone 7 indicated Defendant was using Target Telephone 9 to facilitate the sale of illegal drugs. (Gvt. Exh. 5, Exhibit C at ¶¶ 13(b), 25, 83) Again, the District Court was entitled to rely on Special Agent McKelway's interpretation of such calls. The affidavit also states that toll records for Target Telephone 9 showed numerous contacts with three individuals, all of whom appeared to be responsible for distributing heroin, cocaine and marijuana in the Kansas City area. (Gvt. Exh. 5, Exhibit C at ¶¶ 90-93, 99) Although probable cause supports the search warrant for Franklin's Instagram account, even if that information were excised, the remaining affidavit for Target Telephone 9 still meets the probable cause requirements for issuance of a wiretap.

24

Suppression of wiretap evidence related to Target Telephone 9 is not warranted.

## 2. NECESSITY FOR TARGET TELEPHONE 6 AND TARGET TELEPHONE 9

In order to establish necessity under § 2518(3)(c), law enforcement must "establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator." *United States v. Merrett*, 8 F.4th 743, 749 (8th Cir. 2021) (quoting *United States v. Campbell*, 986 F.3d 782, 793 (8th Cir. 2021)). The statute also allows law enforcement to establish necessity by describing why investigative techniques would be unlikely to be successful or too dangerous. *United States v. Turner*, 781 F.3d 374, 382-83 (8th Cir. 2015). The Eighth Circuit has repeatedly held that the government is not required to exhaust every available investigative technique before applying for a wiretap, or to only use a wiretap as a last resort. *Merrett*, 8 F.4th at 749 (quotations omitted). *See also United States v. Colbert*, 828 F.3d 718, 725 (8th Cir. 2016); *United States v. Milliner*, 765 F.3d 836, 839 (8th Cir. 2014) ("The necessity requirement of § 2518 insures 'that wiretaps are not routinely employed as the initial step in an investigation.'"); *United States v. West*, 589 F.3d 936, 939 (8th Cir. 2009). "If law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and identity of each coconspirator, the necessity requirement is met." *United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003). The Court looks to the four corners of the wiretap application when evaluating necessity. *United States v. Campbell*, No. 17-CR-2045-LLR, 2018 WL 1156238 at 4 (N.D. Iowa Mar. 5, 2018) (citing *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005)). *See also Perez-Trevino*, 891 F.3d at 368, 370 (performing four-corners analysis on necessity argument).

In this case, the information in the May 15, 2019, wiretap application for Target Telephone

25

6 and the June 13, 2019, application for Target Telephone 9 is largely the same related to necessity and will be discussed together. The four corners of both applications establish the requisite necessity. The affidavits state that although investigators had been told that Defendant was involved in drug trafficking, they had not been able to identify his local contacts in the drug trade or confirm information regarding possible locations used to store drugs and/or money derived from drug sales. (Gvt. Exh. 4, Exhibit C at ¶¶ 93, 95; Gvt Exh. 5, Exhibit C at ¶¶ 98-100) The affidavits further state that current investigative techniques being used had not been effective, were reasonably unlikely to succeed if tried, or were too dangerous to employ. (Gvt. Exh. 4, Exhibit C at ¶¶ 94, 97; Gvt Exh. 5, Exhibit C at ¶¶ 99, 102)

Specifically, physical surveillance had proven unsuccessful because Defendant and his associates were very sensitive to the presence of law enforcement investigators. (Gvt. Exh. 4, Exhibit C at ¶¶ 98, 99, 102, 112; Gvt Exh. 5, Exhibit C at ¶¶ 103, 104, 107) When surveillance had been conducted, it showed comings and goings, but did not reveal the reason, the context of conversations, or the identity of individuals with whom conversations were conducted. (Gvt. Exh. 4, Exhibit C at ¶ 109; Gvt Exh. 5, Exhibit C at ¶ 114) Conducting surveillance on this organization had also presented a safety risk to investigators and confidential sources. (Gvt. Exh. 4, Exhibit C at ¶¶ 103, 115; Gvt Exh. 5, Exhibit C at ¶¶ 108, 120) Sources were unwilling or afraid to gather proactive evidence. (Gvt. Exh. 4, Exhibit C at ¶¶ 113, 118, 121; Gvt Exh. 5, Exhibit C at ¶¶ 118, 123, 126) Special Agent McKelway did not believe grand jury subpoenas would be successful, because targets would most likely be uncooperative and invoke their 5th Amendment right not to testify, which would only serve to further alert the targets of the investigation and cause them to become more cautious, flee or otherwise compromise the investigation. (Gvt. Exh. 4, Exhibit C at

26

¶ 116; Gvt Exh. 5, Exhibit C at ¶ 121)  Mail covers had not been useful, and Special Agent McKelway did not believe trash pulls would be likely to provide evidence, since drug traffickers often dispose of their trash in commercial dumpsters.  (Gvt. Exh. 4, Exhibit C at ¶ 124; Gvt Exh. 5, Exhibit C at ¶ 129)  Financial investigations had not revealed large-scale movement of money consistent with the amount of drugs Defendant and his associates have purported to sell.  (Gvt. Exh. 4, Exhibit C at ¶ 126; Gvt Exh. 5, Exhibit C at ¶ 132)  GPS location monitoring had likewise been unsuccessful.  (Gvt. Exh. 4, Exhibit C at ¶ 129; Gvt Exh. 5, Exhibit C at ¶ 135)  Pen registers had only been partially successful, and an intercept is needed to discovery the full scope of the organization's activities.  (Gvt. Exh. 4, Exhibit C at ¶ 127; Gvt Exh. 5, Exhibit C at ¶ 133) Instagram records provided historical information, but did not reveal the full extent of the drug trafficking activities.  (Gvt. Exh. 4, Exhibit C at ¶ 130; Gvt Exh. 5, Exhibit C at ¶ 136)  The affidavit in support of Target Telephone 9 also states Defendant began using Target Telephone 9 rather than Target Telephone 6 to coordinate most of his drug sales. (Gvt Exh. 5, Exhibit C at ¶ 138)

Based on the above, the Court finds that the applications demonstrate the necessity of the wiretaps.  Both affidavits establish that conventional investigatory techniques had not been successful in exposing the full extent of the conspiracy and identity of each coconspirator. The respective affidavits included a full and complete statement as to whether or not investigative procedures had been tried and were unsuccessful or why they reasonably appeared to be unlikely to succeed if tried or were too dangerous.

Defendant argues that law enforcement failed "to employ normal investigative procedures prior to seeking the warrant for Target Phone 9," because eight days after the application was

submitted an arrestee conducted a controlled buy from Defendant. This information was not contained within the four corners of the June 13, 2019, application, thus rendering consideration inappropriate under the instant motion. Nevertheless, law enforcement is not required to exhaust every available technique before applying for a wiretap. *Merrett*, 8 F.4th at 749. Here, the affidavit states that such arrestee told interviewers that s/he was not included in conversations about the inner workings of the organization, and that group members were wary of individuals other than their longtime associates. (Gvt. Exh. 5, Exhibit C at ¶¶ 117, 126) Defendant's motion should be denied.

**3.      GOOD FAITH EXCEPTION**

Even if the May 15, 2019, and/or the June 13, 2019, wiretap applicatioqqqqns were found to be invalid, exclusion of evidence obtained therefrom is still not appropriate. The Eighth Circuit has held that the good-faith exception to the exclusionary rule applies to wiretap orders. *United States v. Friend*, 992 F.3d 728, 731 (8th Cir. 2021); . Here, the affidavits in support of the applications contain the requisite evidence of probable cause and necessity, and Special Agent McKelway knew that the Court agreed. The good-faith exception prevents suppression.

**4.      INDEPENDENT SOURCE DOCTRINE**

The Government seeks a ruling on the applicability of the independent source doctrine to the facts of this case. (Doc. 686, p. 59) Under the independent source doctrine, the government must show: (1) that law enforcement would have applied for the wiretap without the unlawfully-obtained evidence; and (2) that that application would have still been granted. *See United States v. Green*, 9 F.4th 682, 693 (8th Cir. 2021). Both prongs are satisfied in this case. Special Agent McKelway testified that even if he had not first obtained Defendant's Instagram data, he still would

28

have sought a wiretap for Target Telephones 6 and 9 based on intercepts of Target Telephones 1 and 7.  (Fact No. 28)  This information would have provided the probable cause necessary for issuance, *supra* III(B)(1).

## IV.  CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress evidence seized pursuant to the search warrant obtained for his Instagram account (Doc. 648).  It is further

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress evidence seized pursuant to an order authorizing interception of wire and electronic communications (Doc. 647).

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.


/s/ *Jill A. Morris*
JILL A. MORRIS
UNITED STATES MAGISTRATE JUDGE
